CJ-2011-8265

FILED IN THE DISTRICT COURT
OKLAHOMA COUNTY, OKLA.

OCT 28 2011

PATRICIA PRESLEY, COURT CLERK
by _____ DEPUTY

IN THE DISTRICT COURT OF OKLAHOMA COUNTY
STATE OF OKLAHOMA

PAULINE A. RAHHAL, )
 )
    Plaintiff, )
 )
v. ) Case No.
 ) **CJ-2011-8263**
METROPOLITAN PROPERTY & CASUALTY )
INSURANCE COMPANY, d/b/a )
METLIFE AUTO AND HOME, and )
CSC, f/k/a COMPUTER SCIENCES )
CORPORATION )
 )
    Defendants. )

## PETITION

COMES NOW the Plaintiff Pauline A. Rahhal and for her causes of action against Defendant Metropolitan Property & Casualty Insurance Company, d/b/a MetLife Auto and Home, and Defendant CSC, f/k/a Computer Sciences Corporation ("CSC"), states as follows:

### JURISDICTION AND VENUE

1. Plaintiff Pauline A. Rahhal is a citizen of the State of Oklahoma and is domiciled in Oklahoma County, Oklahoma.

2. Defendant Metropolitan and Casualty Insurance Company is incorporated under the laws of the State of Rhode Island, has its headquarters in Warwick, Rhode Island and engages in the business of insurance in the State of Oklahoma. Metropolitan Property & Casualty Insurance Company does business as MetLife Auto and Home in the State of Oklahoma. Defendant Metropolitan Property & Casualty Insurance Company will be referred to hereinafter as "MetLife."

EXHIBIT "2"

does regularly conduct business in the State of Oklahoma.

4. Defendant CSC, f/k/a Computer Sciences Corporation, is incorporated under the laws of the State of Nevada and has its headquarters in Falls Church, Virginia. Defendant CSC will be referred to hereinafter as "CSC."

5. The Court has personal jurisdiction over CSC by virtue of the extensive amount of business it regularly conducts within the State of Oklahoma. Further, because of the specific conduct at issued relating to Plaintiff, including CSC's participation in a civil conspiracy that has an effect both within the State of Oklahoma and on Oklahoma residents. CSC is amenable to service under the Oklahoma long-arm statute and the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice.

6. The accident that gives rise to this lawsuit took place in Oklahoma County, Oklahoma.

7. Venue is proper under 12 O.S. § 137.

### FACTUAL BACKGROUND

8. On August 11, 2010, Plaintiff Pauline A. Rahhal (hereinafter, "Plaintiff") was involved in a motor vehicle accident (hereinafter, "Accident").

9. As a result of the Accident, Plaintiff suffered several severe injuries, including, but not limited to a fractured sternum, a sprained ankle, bruises of the chest and abdomen, contusion of the rib cage, and soft tissue injuries.

10. As a result of the Accident, Plaintiff has incurred over $20,000.00 in medical bills.

2

11. At the time of the Accident, Plaintiff had in place an automobile insurance policy with MetLife that provided uninsured/underinsured motorist ("UM/UIM") coverage benefits.

12. The driver who was at fault in the Accident is an underinsured motorist, as he/she did not have sufficient liability insurance (and/or other assets) to fully compensate Plaintiff for the injuries she suffered in the Accident.

13. After the accident, Plaintiff made a claim to MetLife for UM/UIM benefits for the damages she suffered as a result of the Accident (hereinafter, "the Claim").

14. MetLife used a computer program called Colossus to evaluate the general damages portion of the Claim.

15. On February 7, 2011, MetLife offered Plaintiff $7,000.00 to settle the Claim, which Plaintiff rejected.

16. MetLife utilized Colossus for its evaluation in making the $7,000.00 offer of settlement on February 7, 2011.

17. Despite MetLife's awareness of the extensive and severe injuries suffered by Plaintiff (with medical bills already totaling approximately $20,000.00) as well as the unreasonably low evaluation by Colossus, on February 15, 2011, MetLife offered the "top end" of its evaluation to settle Plaintiff's Claim in the amount of $15,436.00, which Plaintiff also rejected.

18. Colossus is a comprehensive software system, that includes related instructions, guidelines, manuals and customer support that is used by insurance companies to evaluate the general damages portion of bodily injury claims.

19. Colossus is not a database, but rather a rules-based application.

20. CSC is the current owner/licensor of Colossus.

21. Colossus was developed in Australia in the 1980s by Computations Property Limited[1] for the Government Insurance Office of Australia ("the GIO").

22. Colossus was developed for the specific purpose of improving the GIO's financial condition by reducing the amount it paid on claims.

23. Due to Colossus' success for the GIO in Australia, CSC decided to market it to insurers in the United States.

24. Prior to selling/licensing Colossus in the U.S., CSC was aware the evaluation ranges generated by Colossus were not accurate.

25. There inaccuracies are due, at least in come part, to the limited number of injury codes that Colossus recognizes.

26. It was possible to correct, reduce, or eliminate these inaccuracies, but CSC decided not to do so.

27. CSC made no changes to the source code of Colossus before marking it to U.S. insurers.

28. MetLife leases/licenses Colossus from CSC.

29. CSC markets Colossus to insurers as "the most powerful, cost containment innovation available to the property and casualty industry…Never before has there been greater potential to impact profitability."

30. A primary sales tool of CSC was to tout the savings that insurer's could generate by using Colossus to lower claim payments. CSC frequently bragged that Colossus could deliver savings of 20%.

---

[1] Computations Property Limited was later acquired by a company known as Continuum, which later merged with CSC, who is the current owner/licensor of Colossus. Hereinafter, Plaintiff will simply refer to the owner/licensor of Colossus as CSC.

## How Colossus Works

31.  Using its internal assessment rules and tuning algorithms, Colossus converts inputted information about a bodily injury claim into a dollar value or range of dollar values.

32.  Colossus makes value judgments, based on the opinion of its domain experts and creators, which are implemented in the assessment rules, about the relative severity of injuries.

33.  The assessment rules are part of Colossus's internal code and cannot be altered by CSC customers like MetLife.

34.  CSC's customers, including MetLife, are ignorant about the judgments and decisions reflected in the assessment rules.

35.  Colossus rates the severity of a claim based on a linear scale and, pursuant to the assessment rules, assign a certain number of severity points to the claim.

36.  Tuning in the process by which trauma severity points are converted to dollar settlement values, using a mathematical function.

37.  By manipulating a small number of variables, the insurer, such as MetLife, can obtain its desired level of savings.

38.  CSC and its insurance company customers, including MetLife, conspired to influence the "market value" of bodily injury claims downward, by approximately 20%, through the use of Colossus.

39.  To achieve the conspiracy's goal, insurers, including MetLife, paid insureds, such as Plaintiff, less than the true value of their bodily injury claims.

40.  By paying insureds, like Plaintiff, less than the true value of their UM/UIM claim, insurers breached the insurance contract as well as the duty of good faith and fair dealing.

41. In furtherance of the aims of the conspiracy, CSC and its insurance company customers, including MetLife, engaged in certain overt acts, which are described in this Petition.

42. CSC established policies and rules about how Colossus should be used by customers, which were followed by CSC's insurance company customers, including MetLife.

43. Even after they were aware of Colossus' inaccuracies, CSC's customers, including MetLife, continued to use Colossus to evaluate bodily injury claims at CSC's prompting, urging, and behest with CSC's assistance and guidance.

44. CSC and MetLife entered into non-disclosure agreements. CSC and MetLife use these written agreements to justify concealing the use of Colossus from insureds, to oppose legitimate discovery requests, and mislead regulators.

45. CSC developed a discovery program with detailed policies and guidelines to coordinate and manage all discovery related to Colossus to further the aims of the conspiracy by concealing the true nature of Colossus, how it works, and why and how insurers use it.

46. MetLife followed CSC's direction with regard to discovery.

47. In furtherance of the conspiracy, CSC established the Colossus Advisory Council and Colossus User Groups.

48. The Colossus Advisory Council and Colossus User Groups performed a variety of functions related to Colossus, including sharing information about Colossus, promoting Colossus, steering Colossus strategy, and improving the value of Colossus for all customers.

49. CSC demanded secrecy and confidentiality concerning Colossus Advisory Council and Colossus User Group activities. The bylaws and/or policies of these groups expressly required confidentiality. The confidentiality agreements ancillary to the advisory council and user groups further the Colossus scheme.

50. The Colossus Advisory Council also demanded loyalty pledges that members would act in the interest of all Colossus customers. These loyalty pledges are a mechanism for enforcing the conspiracy and its objectives.

51. At least one representative of MetLife served on the Colossus Advisory Council.

52. MetLife representatives attended Colossus User Group meetings.

53. To further the aims of the conspiracy, CSC and MetLife intended to and did conceal from Plaintiffs that MetLife's evaluation of their claim was based upon Colossus and that MetLife used Colossus to achieve the objectives of the conspiracy at the expense of insured like them.

54. CSC and its customers, including MetLife, did not disclose to insureds, such as Plaintiff, in their written materials or marketing materials that Colossus is designed and used to lower claims payments and that it is used to evaluate first-party claims.

55. In furtherance of the conspiracy, code words were frequently used to refer to the true purpose of Colossus, including a policy of using the word "consistency" anytime they really meant "savings," in an effort to conceal from insureds, courts, and regulators that Colossus is designed to, and is used by insurers to, save money by paying less than the fair market value of bodily injury claims.

56. In furtherance of the conspiracy, CSC's insurance company customers often use code words to refer to Colossus itself in an effort to conceal from insureds, courts, and regulators that Colossus was used on a particular claim.

57. The efforts of CSC and its customers, like MetLife, expended to implement Colossus code words expose their intent to conceal truth about Colossus.

58. In furtherance of the conspiracy, CSC and its customers, including MetLife, worked together to suppress and quell internal dissent to avoid complaints about Colossus and how it is used from leaking to the public.

59. CSC and its customers, such as MetLife, even went so far as to disseminate false information about Colossus to its rank and file employees to avoid the possibility of one of them revealing the truth to outsiders, i.e. the courts, regulators, the public, and insureds, like Plaintiff.

60. In furtherance of the conspiracy, CSC and its customers, including MetLife, embarked on sweeping strategy to mislead the public, regulators, and courts about the design, use, defects, errors, and purpose of Colossus. These efforts ranged from misleading and deceptive presentations to regulatory bodies to manipulation of scholarly articles.

## COUNT I: CIVIL CONSPIRACY

61. Plaintiff fully incorporates into this Paragraph each and every allegation contained in Paragraphs 1 through 60 of this Petition, as if each were fully iterated verbatim herein.

62. CSC and its customers, including MetLife, conspired to use Colossus to reduce the amount paid on bodily injury claims.

63. In furtherance of the conspiracy, MetLife has made lowball offers in attempt to settle Plaintiff's Claim and refused to pay Plaintiff all the benefits she is owed under her insurance contract with MetLife.

64. In furtherance of the conspiracy, CSC and MetLife have mislead and deceived Plaintiff, the public, and regulators about Colossus.

65. As a direct and proximate result of CSC and MetLife's unlawful acts in furtherance of the conspiracy, including interference with contract, Plaintiff has suffered

damages, including, but not limited to deprivation of monies rightfully belonging to them, anger, stress, worry, as well as physical and emotional suffering.

66. CSC and MetLife should be held jointly and severally liable for Plaintiff's damages sustained as a result of CSC and MetLife's unlawful conspiracy.

67. WHEREFORE, Plaintiff respectfully prays for judgment against Defendant MetLife and Defendant CSC by reason of their civil conspiracy in an amount in excess of $75,000.00 for the following:

   a. Actual damages;
   b. Consequential damages;
   c. Interest;
   d. Attorney fees;
   e. Costs; and
   f. Such other relief as the Court deems just and equitable.

68. As a result of the civil conspiracy, the conduct of CSC and MetLife was so intentional, willful, malicious, and/or in reckless disregard of the rights of others that punitive damages should be awarded to punish Defendants and deter others.

69. WHEREFORE, Plaintiff respectfully prays for an award of punitive damages against Defendant MetLife and Defendant CSC in excess of $75,000.00.

## COUNT II: BREACH OF CONTRACT

70. Plaintiffs fully incorporate into this Paragraph each and every allegation contained in Paragraphs 1 through 69 of this Petition, as if each were fully integrated verbatim herein.

71. MetLife issued a standard form automobile policy to Plaintiff wherein MetLife agreed to pay an insured person all sums that the insured person is legally entitled to recover as

damages from the owner or operator of an uninsured or underinsured motor vehicle because of bodily injury sustained by the insured person.

72. As a result of the Accident, Plaintiff made a Claim to MetLife for UM/UIM benefits for the damages she suffered.

73. MetLife used a computer program called Colossus to evaluate the general damages portion of the Claim.

74. On February 7, 2011, MetLife offered Plaintiff $7,000.00 to settle the Claim, which Plaintiff rejected.

75. MetLife utilized Colossus for its evaluation in making the $7,000.00 offer of settlement on February 7, 2011.

76. Despite MetLife's awareness of the extensive and severe injuries suffered by Plaintiff (with medical bills already totaling approximately $20,000.00) as well as the unreasonably low evaluation by Colossus, on February 15, 2011, MetLife offered the "top end" of its evaluation to settle Plaintiff's Claim in the amount of $15,436.00, which Plaintiff also rejected.

77. As an insured, Plaintiff is entitled to timely payment of policy benefits properly owed to her including, but not limited to, UM/UIM coverage benefits.

78. The conduct of MetLife in refusing to pay UM/UIM benefits properly owed to Plaintiff is a material breach of the terms and conditions of the respective contract of insurance.

79. As a result of MetLife's breach of the insurance contract, Plaintiff has incurred and continues to incur damages in excess of $75,000.00.

80. WHEREFORE, Plaintiff respectfully prays for judgment against Defendant MetLife by reason of its breach of the insurance contract in an amount in excess of $75,000.00 for the following:

    a. Actual damages;

    b. Consequential damages;

    c. Interest;

    d. Attorney fees;

    e. Costs; and

    f. Such other relief as the Court deems just and equitable.

## COUNT III: BREACH OF THE DUTY TO GOOD FAITH AND FAIR DEALING

81. Plaintiff fully incorporates into this Paragraph each and every allegation contained in Paragraphs 1 through 80 of this Petition, as if each were fully integrated verbatim herein.

82. MetLife has a duty to deal fairly and in good faith with Plaintiff.

83. MetLife breach its duty to deal fairly and in good faith with Plaintiff in the following ways:

    a. MetLife has delayed, without proper cause, paying Plaintiff all benefits to which she is owed under the insurance contract;

    b. MetLife has refused, without proper cause, to pay Plaintiff all benefits to which she is owed under the insurance contract;

    c. MetLife's refusal to promptly pay Plaintiff all benefits to which she is owed under the insurance contract is a result of or in furtherance of conspiracy between MetLife and CSC;

    d. MetLife knowingly and systematically underpays claims, including Plaintiff's, through the use of Colossus;

    e. MetLife knowingly and intentionally failed to engage in proper claims handling practices and failed to compensate its insureds, including Plaintiff, in an amount promised for losses covered under its automobile insurance policies;

    f. MetLife engaged in these improper claims practices knowing that its insured would suffer financial harm;

    g. MetLife deprived Plaintiff of the very protection it promised to provide, which Plaintiff trusted MetLife to give, and for which Plaintiff paid substantial premiums to receive; and

    h. MetLife put its interest in maximizing financial gains and limiting disbursements above the interests of its insured, Plaintiff.

84. As a result of MetLife's breach of duty of good faith and fair dealing, Plaintiff has sustained damages, including, but not limited to deprivation of monies rightfully owed, anger, mental anguish and emotional distress.

85. WHEREFORE, Plaintiff respectfully prays for judgment against Defendant MetLife by reason of its failure to deal fairly and in good faith in an amount in excess of $75,000.00 for the following:

    a. Actual damages;

    b. Consequential damages;

    c. Interest;

    d. Attorney fees;

    e. Costs; and

  f. Such other relief as the Court deems just and equitable.

86. MetLife's breach of the insurer's duty of good faith and fair dealing is so willful, wanton, malicious and in reckless disregard of Plaintiff's rights that punitive damages should be awarded to punish MetLife and deter others.

87. WHEREFORE, Plaintiff respectfully prays for an award of punitive damages against Defendant MetLife in excess of $75,000.00.

## COUNT IV: INTERFERENCE WITH CONTRACT

88. Plaintiff fully incorporated into this Paragraph each and every allegation contained in Paragraphs 1 through 87 of this Petition as if each were fully integrated verbatim herein.

89. Plaintiff had a contract with MetLife.

90. CSC knew that MetLife had contracts with insureds that required MetLife to pay the full amount the insured would be entitled to recover from the owner or operator of an uninsured or underinsured motor vehicle. Therefore, under the circumstances, CSC reasonably should have known about the contract between MetLife and Plaintiff.

91. CSC intentionally induced MetLife to breach its contract with its insureds, including Plaintiff, by paying them less than all the benefits they were owed under the policy.

92. CSC used improper, unfair and inexcusable means to induce MetLife to breach its contract with its insureds, including Plaintiff.

93. Plaintiff suffered damages as a direct result of CSC's actions.

94. WHEREFORE, Plaintiff respectfully prays for judgment against Defendant CSC by reason of its interference with contract in an amount in excess of $75,000.00 for the following:

a. Actual damages;

b. Consequential damages;

c. Interest;

d. Attorney fees;

e. Costs; and

f. Such other relief as the Court deems just and equitable.

Respectfully submitted,

*[signature]*

Reggie N. Whitten, OBA #9576
Michael Burrage, OBA #1350
Simone Gosnell Fulmer, OBA #17037
**WHITTEN BURRAGE**
1215 Classen Drive
Oklahoma City, OK 73103
Telephone:   405-516-7800
Facsimile:    405-516-7859

-and-

Clifton D. Naifeh, OBA #6568
**NAIFEH & ASSOCIATES, P.C.**
870 Copperfield Dr., Suite B
Norman, OK 73072
Telephone:   405-292-2244
Facsimile:    405-292-2288

**ATTORNEYS FOR PLAINTIFFS**